## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ROSE TRENT,                          )
                                     )
                 Plaintiff,          )
                                     )
        v.                           )          1:16CV89
                                     )
NANCY A. BERRYHILL,                  )
Acting Commissioner of Social        )
Security,[1]                         )
                                     )
                 Defendant.          )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Rose Trent, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging an onset date of April 8, 2014.  (Tr. 172-73.)  Upon denial of that application initially (Tr. 74-88, 105-08) and on reconsideration (Tr. 89-104, 115-22), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 66-69, 124).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 31-55.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 11-25.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 7-10), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.   [Plaintiff] meets the insured status requirements of the [] Act through September 30, 2015.

2.   [Plaintiff] has not engaged in substantial gainful activity since April 8, 2014, the alleged onset date.

3.   [Plaintiff] has the following severe impairments: lumbar degenerative disc disease, bilateral knee degenerative joint disease, mild degenerative joint disease of the left wrist, history of thyroid cancer and total thyroidectomy, asthma, and bipolar I disorder.

. . .

4.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform medium work. [Plaintiff] is able to lift and carry fifty pounds occasionally and twenty-five pounds frequently. In an eight-hour workday, she is able to stand and/or walk for six hours total and sit for six hours total. [Plaintiff] is able to occasionally climb, kneel, crouch, and crawl. She can frequently balance. She should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. She is able to perform simple, routine, repetitive tasks.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

11. [Plaintiff] has not been under a disability, as defined in the [] Act, from April 8, 2014, through the date of this decision.

(Tr. 16-25 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

[Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

'sequential evaluation process' to determine whether a claimant is disabled."  Id.

This sequential evaluation process ("SEP") has up to five steps:  "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment,

---

[3]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ."  Hunter, 993 F.2d at 35 (internal citations omitted).

the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## B. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

(1) "[t]he ALJ improperly evaluated [Plaintiff's] symptoms" (Docket Entry 13 at 3 (bold font omitted)); and

(2) "[t]he ALJ performed an improper RFC evaluation" (id. at 7 (bold font omitted)).

Defendant disputes Plaintiff's assignments of error, and urges that substantial evidence supports the finding of no disability. (See Docket Entry 15 at 3-12.)

### 1. Symptom Evaluation

In Plaintiff's first assignment of error, she contends that "the ALJ improperly evaluated [Plaintiff's] symptoms . . . due to her thyroidectomy and bipolar disorder because [the ALJ] failed to rely on objective medical evidence which support[ed] [Plaintiff's] statements." (Docket Entry 13 at 5 (citing Tr. 21-23).) More specifically, Plaintiff alleges that the ALJ inappropriately assumed that a planned ultrasound of Plaintiff's neck, the results of which do not appear in the record, showed no change from previous studies, based upon the fact that Plaintiff "ha[d] not required additional surgery" for her thyroid. (Id.) Regarding Plaintiff's bipolar disorder, Plaintiff faults the ALJ for "predict[ing], without any evidence of record" that Plaintiff's decision to start taking Cymbalta would improve her depression and

her pain (id. at 6 (citing Tr. 23)), and for improperly evaluating the opinions of consultative psychological examiner Dr. Robert H. Abramowitz (id. (citing Tr. 22, 430, 432)), and treatment records from psychiatrist Dr. Jeffrey Smith regarding Plaintiff's mental symptoms (id. (citing Tr. 22, 360-64, 554, 556-57, 558-59, 582)). Plaintiff's contentions warrant no relief.

Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements ("SSR 96-7p"), 1996 WL 374186 (July 2, 1996), as applied by the Fourth Circuit in Craig, 76 F.3d at 594-95, provides a two-part test for evaluating a claimant's statements about symptoms. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 594 (quoting 20 C.F.R. § 404.1529(b)). Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which they affect his or her ability to work. Id. at 595. In making that determination, the ALJ:

> must take into account not only the claimant's statements
> about her pain, but also all the available evidence,
> including the claimant's medical history, medical signs,
> and laboratory findings, any objective medical evidence

of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.), and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Id. (internal citations and quotation marks omitted).[6]

In this case, the ALJ found for Plaintiff on part one of the inquiry, but ruled, in connection with part two, that her statements "concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely credible for the reasons explained in [the ALJ's] decision." (Tr. 20.) In making that part two finding, the ALJ discussed Plaintiff's daily activities and her testimony, as well as the objective findings relevant to Plaintiff's thyroid impairment and bipolar disorder. (See Tr. 19-20, 21-23.) With regard to the objective evidence, the ALJ noted as follows:

---

[6] Effective March 28, 2016, see Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1237954 (Mar. 24, 2016) (correcting effective date of original Ruling), the Social Security Administration superseded SSR 96-7p with Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *1 (Mar. 16, 2016). The new ruling "eliminat[es] the use of the term 'credibility' from . . . sub-regulatory policy, as [the] regulations do not use this term." Id. The ruling "clarif[ies] that subjective symptom evaluation is not an examination of the individual's character," id., and "offer[s] additional guidance to [ALJs] on regulatory implementation problems that have been identified since [the publishing of] SSR 96-7p," id. at *1 n.1. The ALJ's decision in this case predates the effective date of SSR 16-3p (see Tr. 25), and, because SSR 16-3p changes existing Social Security Administration policy regarding subjective symptom evaluation, that Ruling does not apply retroactively, see Bagliere v. Colvin, No. 1:16CV109, 2017 WL 318834, at *4-8 (M.D.N.C. Jan. 23, 2017) (Auld, M.J.), recommendation adopted, slip op. (M.D.N.C. Feb. 23, 2017) (Eagles, J.); see also Hose v. Colvin, No. 1:15CV00662, 2016 WL 1627632, at *5 n.6 (M.D.N.C. Apr. 22, 2016) (unpublished) (Auld, M.J.), recommendation adopted, slip op. (M.D.N.C. May 10, 2016) (Biggs, J.).

Overall, [Plaintiff's] allegations are out of proportion
to the objective medical findings . . . .

. . .

Regarding [Plaintiff's] thyroid, the record shows that
[Plaintiff] had a thyroid ultrasound in June 2013 that
showed a dominant nodule in the left thyroid lobe.
[Plaintiff] underwent total thyroidectomy in October 2013
and the pathology results were consistent with follicular
carcinoma. [Plaintiff] had I-131 treatment in November
2013. In March 2014, a month before the alleged onset
date, a thyroid ultrasound was negative except for a
small nonspecific hypoechoic area in the right thyroid
bed or just about it that needed monitoring on subsequent
ultrasounds. There were no abnormal appearing lymph
nodes. While [Plaintiff] expressed frustration about her
condition, as of June 2014, [Plaintiff's] thyroid hormone
was in a better range than it had been since surgery.

In 2015, [Plaintiff] had been taking tirosint. As of
April 2015, [Plaintiff] was doing well on tirosint. An
ultrasound of her head and neck obtained that month
showed echogenic soft tissue in the thyroid bed possibly
representing residual thyroid tissue post ablation. She
established with a new endocrinologist in May 2015.
[Plaintiff] complained [that she] continued to suffer
from nausea, vomiting, diarrhea and weight loss since
receiving Thyrogen. The normal course of action was an
I-131 scan but she had a previous allergic reaction.
<u>Given her limited treatment options due to allergies and
adverse reactions, the plan was to do another neck
ultrasound and address surgically any increasing thyroid
bed tissue. Since [Plaintiff] has not required any
additional surgery, it seems reasonable to conclude that
the ultrasound was unchanged</u>.

. . .

The undersigned has also considered [Plaintiff's] bipolar
disorder. Diagnosed as a teenager, [Plaintiff] was able
to work despite this for many years. The longitudinal
record shows that her symptoms wax and wane. As of
January 2014, a few months before the alleged onset date,
[Plaintiff] was doing "OK" with stable mood and bright
affect. A month later, and continuing to April 2014, the
alleged onset date, [Plaintiff] reported some increased
symptoms in the face of psychosocial stress. By mid-May

11

2014, [Plaintiff] was doing much better with less moodiness, less worry, stable mood, and improved motivation and interest. In July 201[4], she had some increased depression. With medication adjustments, [Plaintiff] showed signs of improvement in September 2014. By October 14, 2014, she was doing "pretty well" with "rare down days." Depression, irritability, and impulsiveness were well controlled and she endorsed good energy, motivation, interest, and concentration.

Then, at the consultative psychological examination on October 30, 2014, [Plaintiff] reported significant symptoms. She stated that she wakes up crying, thinking that "God has forsaken [her]." She stated that she is "miserable," unmotivated, and feels helpless and worthless. She reported that she had "given up" doing housework. <u>The consultative examiner noted that [Plaintiff's] long-term memory was somewhat limited and her short-term memory was poor. She was close to average range for concentration.</u>

<u>It seems that her condition soon improved, as subsequent psychiatric records show that her depression was well controlled and she endorsed good energy, motivation, interest, and concentration for the first half of 2015.</u> She had a brief increase in agitation and depression on June 1, 2015, but by June 12, 2015, she reported no anxiety or depression. On June 25, 2015, she stated that she was doing better with less agitation and impulsivity and improved energy, motivation, interest, and concentration. <u>[Plaintiff] finally started Cymbalta in July 2015, which should help her depression, as well as her pain.</u>

(Tr. 20-23 (emphasis added) (internal citations omitted).)

Plaintiff challenges the ALJ's statement that, because Plaintiff "has not required any additional surgery, it seems reasonable to conclude that the ultrasound was unchanged." (Docket Entry 13 at 5 (quoting Tr. 22).) According to Plaintiff, given the ALJ's acknowledgment that endocrinologist Dr. Tony Walden's opinion corroborated Plaintiff's thyroid-related complaints of nausea,

vomiting, diarrhea, and weight loss, the ALJ's assumption that a "yet to be completed" ultrasound showed no change in Plaintiff's condition "was improper and irrational." (Id. (citing Tr. 21-22).) Plaintiff's argument ultimately fails.

At the outset, the record does not support Plaintiff's assertion that "[t]he ALJ acknowledged that . . . Dr. Walden's opinion corroborated [Plaintiff's] subjective complaints" regarding her thyroid disorder. (Id. at 5.) The ALJ merely observed, while discussing Plaintiff's course of treatment for her thyroid impairment, that Plaintiff "complained [that she] continued to suffer from nausea, vomiting, diarrhea and weight loss since receiving Thyrogen" at an appointment with Dr. Walden in May 2015. (Tr. 22 (emphasis added).) Indeed, Dr. Walden recorded Plaintiff's complaint of nausea, vomiting, diarrhea, and flu-like symptoms that had resolved three months earlier in February 2015 (see Tr. 539), and made no objective findings on examination that corroborated Plaintiff's subjective thyroid complaints (see Tr. 542-543).

However, the ALJ's assumption that, because Plaintiff had not undergone additional thyroid surgery by the date of the ALJ's decision, a neck ultrasound of Plaintiff not of record likely showed no change in Plaintiff's thyroid condition (see Tr. 22) lacks any factual support. The record does not reflect the reason why Plaintiff did not undergo such surgery, and any number of factors other than a benign ultrasound, e.g., lack of insurance,

13

other medical complications, etc., could have caused Plaintiff to forego the surgery.

Nevertheless, the ALJ's improper assumption amounts to harmless error under the facts presented by this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). As quoted above, the ALJ did not rely solely on his assumption regarding Plaintiff's planned neck ultrasound in evaluating the intensity, persistence, and limiting effects of Plaintiff's thyroid symptoms; rather, the ALJ also considered Plaintiff's earlier, fairly benign neck ultrasound results and improved thyroid hormone levels. (See Tr. 22-23.) Because the ALJ relied on other substantial evidence to support his conclusions regarding Plaintiff's thyroid impairment, his improper assumption qualifies as harmless. See Carmickle v. Commissioner of Soc. Sec., 533 F.3d 1155, 1162 (9th Cir. 2008) (holding that, although ALJ relied on two invalid reasons in credibility determination, "[s]o long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal" (quotation marks and brackets omitted)); Trefethen v. Colvin, Civ. No. 12-1047-EFM, 2014

WL 289458, at *5 (D. Kan. Jan. 27, 2014) (unpublished) (concluding that ALJ's mistaken assumption regarding chronology of mental evaluations amounted to harmless error because other substantial evidence supported ALJ's finding that claimant improved with treatment); compare Schandel v. Commissioner for Soc. Sec. Admin., No. 4:14-CV-00042, 2016 WL 3268758, at *3 (W.D. Va. June 7, 2016) (unpublished) (remanding case and noting that "[t]he primary flaw is the ALJ's almost-exclusive reliance on facts not found in the [r]ecord[] [i]n rejecting [the] [p]laintiff's subjective statements regarding 'the intensity, persistence, and limiting effects of [his] symptoms'" (emphasis added)).[7]

Plaintiff additionally faults the ALJ for "predict[ing], without any evidence of record" that Plaintiff's decision to start taking the anti-depressant Cymbalta would improve her depression and her pain. (Docket Entry 13 at 6 (citing Tr. 23).) According to Plaintiff, the ALJ lacks "the training and expertise to make such predictions." (Id. at 7.)

The Commissioner, in turn, argues that "the ALJ fairly considered Plaintiff's use of Cymbalta in his decision," because the ALJ "did not find she lacked credibility on the basis of any prediction of improvement." (Docket Entry 15 at 9 (citing Tr.

---

[7] Had the planned ultrasound actually shown that Plaintiff's thyroid condition had worsened, or had Plaintiff undergone additional thyroid surgery, Plaintiff had the opportunity to submit such evidence to the Appeals Council in connection with her request for review, or to this Court in conjunction with her request for judicial review. Notably, Plaintiff took neither action. (See Tr. 1-10; Docket Entries dated February 2, 2016, to the present.)

23).) Rather, the Commissioner posits that the ALJ discounted Plaintiff's credibility because, "[i]f Plaintiff's mental impairments were as debilitating as she alleged, she would have listened to her physicians who recommended that she use [Cymbalta]." (Id. (citing Tr. 590).)

The Commissioner's argument fails as an impermissible, post-hoc rationalization of the ALJ's reasoning. See Securities & Exch. Comm'n. v. Chenery Corp., 332 U.S. 194, 196 (1947); see also Bray v. Commissioner of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ - not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." (citing Chenery)). The ALJ did not specifically find that Plaintiff lacked credibility because she declined to start taking Cymbalta when her doctor first recommended it; rather, he merely noted that Plaintiff "finally started Cymbalta in July 2015, which should help her depression, as well as her pain." (Tr. 23.)[8]

Moreover, the record does not support the ALJ's prediction that Cymbalta would improve Plaintiff's depression and pain. (See

---

[8] Even had the ALJ expressly discounted Plaintiff's credibility for opting not to take Cymbalta when her doctor first prescribed it, the record would not support such an adverse credibility inference. Plaintiff's treatment records from Dr. Smith reflect that she tried many different psychiatric drugs at different dosages and with varying rates of success throughout the relevant period in this case (see Tr. 360-64, 554-59), and started Cymbalta merely one month after her doctor recommended she take it (see Tr. 586, 606).

Tr. 23.)  Plaintiff's psychiatrist prescribed many different psychiatric medications and dosages during the relevant period, in an attempt to keep Plaintiff's bipolar symptoms under control.  The treatment notes reflect that these medication changes had varying success rates and, at times, only provided temporary relief.  (See Tr. 360-64, 554-59.)  Thus, no basis existed for the ALJ to predict that Cymbalta would prove any more effective than the other medications that Plaintiff tried.

However, the ALJ's erroneous prediction regarding Cymbalta remains harmless, because the ALJ relied on other substantial evidence to evaluate the intensity, persistence, and limiting effects of Plaintiff's bipolar symptoms.  See generally Fisher, 869 F.2d at 1057.  In that regard, the ALJ noted that (1) Plaintiff remained able to work despite her bipolar symptoms for many years; (2) Plaintiff's symptoms waxed and waned, with many extended periods where the symptoms remained well controlled; and (3) the consultative psychological examiner rated Plaintiff's concentration as close to average range.  (See Tr. 22-23.)  Thus, the ALJ's faulty prediction concerning Cymbalta did not render his overall analysis of Plaintiff's bipolar symptoms unsupported by substantial evidence.  See Carmickle, 533 F.3d at 1162; Trefethen, 2014 WL 289458, at *5.

Plaintiff also faults the ALJ for improperly evaluating the opinions of consultative psychological examiner Dr. Abramowitz.

(Docket Entry 13 at 6 (citing Tr. 22, 430, 432).) More specifically, Plaintiff contends that "the ALJ failed to acknowledge [Dr. Abramowitz's] objective opinion that 'at times [Plaintiff] started to ramble and became somewhat unfocused'" (id. (quoting Tr. 430)), that Plaintiff's "'affect was mostly depressed,' and [that] 'she [did] not appear to be emotionally capable or stable enough to handle stress and pressure of a work setting'" (id. (quoting Tr. 432)). Plaintiff's contentions fall short.

Although the ALJ did not expressly discuss Dr. Abramowitz's observations that Plaintiff's affect appeared "mostly depressed" and that she rambled and seemed "somewhat unfocused" at times during the examination (see Tr. 16-25, 430, 432), the ALJ labored under no obligation to explicitly discuss every finding in each piece of evidence in the record, see Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995). Moreover, the ALJ stated that he had "careful[ly] consider[ed] [] the entire record" (Tr. 19 (emphasis added)), and discussed Dr. Abramowitz's opinions at three different places in his opinion (see Tr. 18 (step three), 22 (credibility analysis), 23 (opinion evidence evaluation)). Moreover, the ALJ did discuss Dr. Abramowitz's opinion that Plaintiff did "not appear to be emotionally capable or stable enough to handle stress and pressure of a work setting" (Tr. 432), but gave that opinion "less weight"

as based on a one-time evaluation and unsupported by Dr. Smith's subsequent treatment records (see Tr. 23). Thus, Plaintiff has not shown how the ALJ's failure to specifically mention the findings in question caused her any prejudice.

Plaintiff further challenges the ALJ's conclusion, based on his evaluation of Dr. Smith's treatment records, that Plaintiff's mental condition had improved. (See Docket Entry 13 at 6-7 (citing Tr. 22, 360-64, 554, 556-57, 558-59, 582).) More particularly, Plaintiff emphasizes that she "characterized her mood swings as severe and her bipolar disorder as rapid cycling," and that Dr. Smith's treatment records "clearly depict[] her mood swings as such." (Id. at 7 (citing Tr. 45-46).) Thus, Plaintiff argues, "for the ALJ to assert because the most recent psychiatric records showed she was doing better that her subjective complaints were not supported by the evidence, was improper and irrational." (Id. (citing Tr. 22-23).) That argument misses the mark.

The ALJ clearly acknowledged Plaintiff's testimony that she "has highs and lows" (Tr. 20), found that "[t]he longitudinal record shows that [Plaintiff's bipolar] symptoms wax and wane" (Tr. 22), and discussed Plaintiff's fluctuations in mood at visits with Dr. Smith from January 2014 to June 2015 (Tr. 22-23). However, the ALJ also correctly observed that, with the exception of the October 30, 2014, consultative psychological examination (see Tr. 428-32), "known to [Plaintiff] to be for the purposes of evaluating

19

disability" (Tr. 23), and a brief period in June 2015 (see Tr. 558), Plaintiff gave positive reports about her symptom control from September 2014 through June 2015 (see Tr. 554-59). (Tr. 22-23; see also Tr. 18 ("[T]he record shows that [Plaintiff] reports fluctuating, but generally improved symptoms to her psychiatrist.").) Thus, the ALJ did not err in evaluating Dr. Smith's treatment records.

In short, Plaintiff's claim that the ALJ improperly evaluated her thyroid and bipolar symptoms fails as a matter of law.

## 2. RFC

In Plaintiff's second and final issue on review, she asserts that "[t]he ALJ performed an improper RFC evaluation." (Docket Entry 13 at 7 (bold font omitted).) More specifically, Plaintiff contends that the ALJ violated Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), in two respects: (1) the ALJ failed to explain which of Plaintiff's subjective complaints he found only partially credible (Docket Entry 13 at 8-9); and (2) the ALJ neglected to account for Plaintiff's moderate deficits in concentration, persistence, or pace ("CPP") in the RFC determination (id. at 9-10). Neither of those contentions warrants relief.

In regards to the ALJ's analysis of Plaintiff's subjective complaints, the Court should find Mascio distinguishable. In that case, a conflict existed between the ALJ's conclusion that the plaintiff's "allegation that her pain caused daytime fatigue was

'less credible' because she did not complain about this side effect to her doctors" and another of the ALJ's findings that the plaintiff's "pain medication 'impacts her thought processes.'" Mascio, 780 F.3d at 638 (internal citations omitted). The Mascio court observed that the conflict "leaves us to wonder if the ALJ found her claim of fatigue partially or completely incredible," and found that the "inconsistency needs to be explained." Id.

Here, Plaintiff points to no such conflict. Plaintiff maintains that "the ALJ argued [Plaintiff's] complaints of mood swings and issues related to her thyroidectomy were not supported," and points to other findings by the ALJ which Plaintiff contends conflict with that finding and support her subjective complaints. (Docket Entry 13 at 9 (citing Tr. 22-23) (emphasis added).) The emphasized portion of Plaintiff's argument suggests the ALJ found that Plaintiff lacked any symptoms from her bipolar and thyroid disorders. However, the ALJ clearly acknowledged that Plaintiff suffered from mood swings and residual thyroid symptoms throughout the relevant period, but found that the record did not support the alleged intensity, persistence, and limiting effects of those symptoms. (See Tr. 20, 22-23.) As described in the preceding subsection, the ALJ's discussion of Plaintiff's course of treatment and objective findings on examination regarding her bipolar and thyroid disorders (see Tr. 22-23), permit the Court to meaningfully review the ALJ's credibility conclusions.

Lastly, Plaintiff maintains that, pursuant to <u>Mascio</u>, "'an ALJ does not account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work . . . [because] the ability to perform simple tasks differs from the ability to stay on task,' and '[o]nly the latter limitation would account for a claimant's limitation in [CPP].'" (Docket Entry 13 at 9-10 (quoting <u>Mascio</u>, 780 F.3d at 638 (internal quotation marks omitted)).) According to Plaintiff, the ALJ's failure to include Plaintiff's difficulties in maintaining concentration in the RFC justifies reversal of the case. (<u>Id.</u> at 10.) Plaintiff's argument falls short.

The United States Court of Appeals for the Fourth Circuit has held that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." <u>Mascio</u>, 780 F.3d at 638. However, that court also allowed for the possibility that an ALJ could adequately explain why moderate limitation in concentration, persistence, or pace would not result in any limitation in the RFC. <u>Id.</u> A neighboring district court had occasion to discuss this very point:

> <u>Mascio</u> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace <u>always</u> translates into a limitation in the RFC. Rather, <u>Mascio</u> underscores the ALJ's duty to adequately review the evidence and explain the decision . . . . An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the

record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (Magistrate Judge's Report & Recommendation adopted by District Judge) (unpublished) (emphasis added). Here, the ALJ's decision provides a sufficient explanation as to why a limitation in the RFC to simple, routine, and repetitive tasks ("SRRTs") sufficiently accounted for Plaintiff's moderate limitation in CPP.

First, the ALJ discussed Plaintiff's testimony regarding her bipolar symptoms, but concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely credible." (Tr. 20.) As detailed in the preceding subsection, the ALJ supported his analysis of Plaintiff's bipolar symptoms with substantial evidence.

Second, the ALJ summarized Plaintiff's mental health treatment, making the following, pertinent observations:

- Plaintiff remained able to work despite her bipolar disorder for many years.

- "With medication adjustments, [Plaintiff] showed signs of improvement in September 2014. By October 14, 2014, she was doing 'pretty well' with 'rare down days.' Depression, irritability, and impulsiveness were well controlled and she endorsed good energy, motivation, interest, and concentration."

- Plaintiff's "depression was well controlled and she endorsed <u>good</u> energy, motivation, interest, and <u>concentration</u> for the first half of 2015."

(Tr. 22 (emphasis added) (internal citations omitted).)

Third, the ALJ also discussed and weighed the opinion evidence as it related to Plaintiff's ability to function mentally. (<u>See</u> Tr. 23.) The ALJ noted the opinion of consultative psychological examiner Dr. Abramowitz that Plaintiff's concentration "was close to average range" (Tr. 18, <u>see also</u> Tr. 431), gave "great weight" to Dr. Abramowitz's opinion that Plaintiff "appeared to be cognitively strong and capable of learning and following directions" (Tr. 23 ; <u>see also</u> Tr. 432), and found that Dr. Abramowitz's opinion "suggest[ed] that [Plaintiff] [wa]s able to understand, remember, and carry out [SRRTs]" (Tr. 23). The ALJ also gave "great weight" to the state agency psychological consultants's opinions that Plaintiff can perform SRRTs. (Tr. 23.) Notably, both consultants found that Plaintiff suffered moderate limitation in CPP (<u>see</u> Tr. 79, 95), but that, despite that concentrational deficit, Plaintiff remained "able to understand and remember simple instructions" (Tr. 83, 99), and "able to <u>maintain attention</u> for simple tasks" (Tr. 84, 100 (emphasis added)).[9] Under these circumstances, the ALJ adequately

---

[9] Although the state agency psychological consultant at the reconsideration level, Dr. Bonny Gregory, concluded that Plaintiff remained <u>cognitively</u> able to understand and maintain attention to complete SRRTs (<u>see</u> Tr. 99, 100), Dr. Gregory also found that Plaintiff could not interact with others for even short periods of time due to mood swings and could not adapt to basic workplace
(continued...)

explained why a limitation to SRRTs sufficiently accounted for Plaintiff's moderate limitation in CPP. See Hutton v. Colvin, No. 2:14-CV-63, 2015 WL 3757204, at *3 (N.D.W. Va. June 16, 2015) (unpublished) (finding reliance on Mascio "misplaced" and that ALJ "gave abundant explanation" for why unskilled work adequately accounted for claimant's moderate limitation in concentration, persistence, or pace, where ALJ relied on the claimant's daily activities and treating physicians' opinions of claimant's mental abilities).

In sum, the ALJ complied with Mascio and supported his RFC determination with substantial evidence.

---

[9] (...continued)
changes, rendering her, from an emotional and adaptability standpoint, unable to perform even SRRTs. (Tr. 100, 101; see also Tr. 95.) Despite that finding, the Social Security Administration ultimately found at the reconsideration stage that Plaintiff remained capable of performing SRRTs, could perform jobs existing in significant numbers in the national economy, and qualified as "Not Disabled." (Tr. 102.) Neither Plaintiff nor the Commissioner addressed this apparent internal inconsistency in the reconsideration stage determination in their briefing to this Court. (See Docket Entry 13 at 3-10; Docket Entry 15 at 3-12.) Because both state agency psychological consultants agreed that, despite moderate deficit in CPP (see Tr. 79, 95), Plaintiff remained able to understand and maintain attention to complete SRRTs (see Tr. 83, 84, 99, 100), and because Plaintiff failed to address the internal inconsistency of the reconsideration stage determination on judicial review (see Docket Entry 13 at 3-10), the ALJ's decision adequately explains why a limitation to SRRTs sufficiently accounted for Plaintiff's moderate limitation in CPP. See generally United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever holds its peace."); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

### III. CONCLUSION

Plaintiff has not established an error warranting reversal or remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 20, 2017